United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHEVRON U.S.A., INC., | No. C 05-03276 WHA |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| SSD & ASSOCIATES, | |
| Defendant. | |

## INTRODUCTION

In this declaratory judgment action, plaintiff Chevron U.S.A., Inc., moves for summary judgment. Plaintiff Chevron and defendant SSD & Associates had a franchise agreement by which defendant operated a Chevron-brand service station. Chevron claims SSD seriously breached the agreement, entitling Chevron to terminate the franchise. SSD did breach material terms of the agreement. There are, however, material issues of fact as to whether those breaches were serious enough to warrant termination. For this reason, summary judgment on Chevron's entitlement to terminate the franchise is **DENIED**. The complaint also requested a judgment that SSD breached material terms of the franchise agreements. Defendant concedes this point. The motion on this issue therefore is **GRANTED**.[1]

---

[1] In the complaint, plaintiff also asked for a judgment requiring defendant to surrender the service station to plaintiff by November 8, 2005. Time has made this issue moot. Plaintiff also requested an award of attorney's fees and costs. It did not, however, pursue this issue in its motion for summary judgment.

**STATEMENT**

Plaintiff and defendant entered into a series of agreements to govern the franchise relationship by which defendant operated a Chevron-brand service station in San Ramon from October 1, 2002, through September 30, 2005. The agreement required SSD to pay rent based in part on its sales volume. Chevron and SSD also agreed that the dealer would use a computer system to collect sales data from the cash registers and automatically deliver it to Chevron via satellite. To give Chevron a way to double-check the accuracy of the electronic data, the agreement required SSD to maintain certain business records and to allow Chevron to audit them (Phelps Decl., Exh. A (Dealer Lease, Optional Temporary Partial Rent Waiver and Electronic Transaction Authorization Agreement, Dealer Supply Contract (Lessee Dealer), RAN System Amendment to Dealer Lease, various ancillary agreements, and amendments) (collectively, the "agreement")).

In a letter delivered August 9, 2005, Chevron notified defendant that it would terminate the franchise in ninety days (Phelps Decl, Exh. B (Not. of Termination) and Exh. D (Dhillon Dep. (Apr. 6, 2006) (acknowledging receipt of notice on Aug. 9, 2005). The notice stated that, during an audit, defendant had failed to produce the following documents for 2002 to 2004: (1) purchase journals summarizing food mart inventory purchases, (2) financial statements, and (3) income tax returns (Phelps Decl., Exh. B). It claimed that the failure to produce these records was a violation of section 4(d) of the Dealer Lease. Section 4 of the Dealer Lease is entitled "RENT." Subsection (d) provides that:

> In order to confirm Dealer's performance of Dealer's obligations under the Lease, Chevron shall have the right . . . to audit all books and records relating to Dealer's operation of the Premises . . . . Dealer shall within the time specified in [the audit notice] produce such books and records for inspection and/or copying by Chevron. Dealer shall maintain such books and records relating to Dealer's operation of the [gasoline station] as may be specified by Chevron from time to time in Chevron's Rental Accounting Guide . . . . Dealer acknowledges receipt of Chevron's Rental Accounting Guide

(Phelps Decl., Exh. A). The stated purpose of the audit is thus to verify rent.

2

1  Two days after giving notice of the termination, Chevron filed its complaint in the
2  instant action. Later, defendant created all the records that were missing and gave them to
3  plaintiff (Dhillon Decl. ¶ 18).

## ANALYSIS

Summary judgment is proper where the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c), (e). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). A genuine dispute as to a material fact exists if there is sufficient evidence for a reasonable finder of fact to return a verdict for the nonmoving party. On summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

Termination of a gasoline-station franchise is governed by Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. 2801–2806. The Act was adopted to protect "franchisees from arbitrary or discriminatory termination . . . of their franchises. [A]s remedial legislation, the Act must be given a liberal construction consistent with its goal of protecting franchisees." *Khorenian v. Union Oil Co. of Cal.*, 761 F.2d 533, 535 (9th Cir. 1985) (internal citations and quotation marks omitted).

The Act bars refiners and distributors from terminating franchises except under certain circumstances. 15 U.S.C. 2802(a). One of these is the "failure by the franchisee to comply with any provision of the franchise," so long as the provision "is both reasonable and of material significance to the franchise relationship." 15 U.S.C. 2802(b)(2)(A). A "failure" to comply, however, has a limited definition under the statute. "The term 'failure' does not include . . . any failure which is only technical or unimportant to the franchise relationship . . . ." 15 U.S.C. 2801(13)(A). Therefore, a refiner or distributor only can terminate an agreement if (1) the franchisee's breach is more than merely technical and (2) the breach was important to the "franchise relationship." As the Ninth Circuit put it: "[i]n making determinations in

franchise termination cases under the [Petroleum Marketing Practices Act], we look not only at the nature of the provision allegedly violated, but also at the nature and effect of the alleged breach." *Khorenian*, 761 F.2d at 536.[2]

Chevron cites *DiNapoli v. Exxon Corp.*, 549 F. Supp. 449, 453 (D. N.J. 1982), for the proposition that the "focus of section 2802(b)(2)(A) is the reasonableness of the contract provision, not of the franchise termination" (Br. 8). In fact, the Ninth Circuit and Congress effectively require an inquiry into the reasonableness of the termination. A court assessing the propriety of termination under section 2802(b)(2)(A) must decide whether the breach was significant enough to warrant ending the franchise. Termination is improper if the breach was not serious. In other words, the franchisor's reaction must be proportionate to the breach. A finding that they were proportionate is tantamount to holding that the termination was reasonable. A finding to the contrary is, for all practical purposes, a holding that the termination was unreasonable. *DiNapoli* does not make this point clear. To the extent *DiNapoli* contradicts binding Ninth Circuit precedent, it is rejected.

This order turns first to Chevron's claim that it is entitled to a judgment that defendant breached material terms of the franchise agreements. After that, it considers the requested judgment that Chevron is entitled to terminate the franchise.

**1.    BREACH OF MATERIAL TERMS OF FRANCHISE AGREEMENTS.**

Chevron claims that defendant violated section 4(d) of the Dealer Lease. Defendant "does not dispute that . . . it did not have all of the required business records at the time of the examination" (Opp. 9). By this statement and others, defendant concedes that it breached section 4(d) of the Dealer Lease by failing to produce the records at the appointed time. This order therefore considers the breach of the agreement as conceded.

---

[2] Termination also is proper if it is reasonable, based on some event that is relevant to the franchise relationship. 15 U.S.C. 2802(b)(2)(C). Such events include fraud or crime by the franchisee, or failure by the franchisee to comply with federal, state or local laws or regulations, provided such actions or laws are relevant to the operation of the gas station. 15 U.S.C. 2802(c)(1), (c)(11). Although this justification for ending the franchise was given in the termination notice, Chevron is not pursuing it in the instant motion.

4

The next question is whether the provisions that defendant violated were "material" to the overall agreement. Throughout its opposition brief, defendant claims repeatedly that its *breach* of the agreements was not material (Opp. 2). Nowhere does defendant claim that the *provisions* that it violated were immaterial to the agreement generally. Defendant thus concedes that the provisions it violated were material. Plaintiff therefore is entitled to summary judgment on this issue.

### 2. PLAINTIFF'S ENTITLEMENT TO TERMINATE THE FRANCHISE.

Defendant argues that the instant motion must be denied because there are "genuine issue[s] as to [] material fact[s]," FRCP 56(c). The material facts allegedly in dispute are whether defendant's failure to produce the documents on time was sufficiently important to justify terminating the franchise, despite defendant's late delivery of the documents to plaintiff. In support of this argument, defendant produced a declaration by Surinder Dhillon, its chief executive officer, in which he stated that, after the audit, defendant prepared all the missing documents using valid source material, such as cancelled checks and purchase invoices, then provided the documents to Chevron (Opp. 18). He stated:

> In September 2005, SSD provided the required tax returns to Chevron, in October 2005, SSD provided Chevron the requested financial statements and in December 2005, SSD provided Chevron with the food mart purchase journals. . . . [T]he numbers used for these reports did not come from Mr. Oseguera's [the Chevron auditor's] report. Instead, these reports were prepared from the source documents [][(i.e., journal tapes, end of shift Z-reports, end of day Z-reports, cancelled checks, purchase invoices, bank records, contemporaneous back office computer reports and department and group reports[][)] . . . that would be the basis for such reports even when they are prepared currently

(Dhillon Decl. ¶ 18).

This evidence only can be evaluated properly in light of the reason why defendant was required to maintain the records and produce them for audits. Chevron conducted audits to confirm that dealers were paying enough rent. Rent was based on each dealer's sales (Phelps Decl., Exh. A (Dealer Lease, Section 4(d); Optional Temporary Partial Rent Waiver and Electronic Transaction Authorization Agreement)). Without being able to determine if the

5

electronic sales figures reported to plaintiff were correct, it had no way of verifying that proper rent was being paid. Plaintiff underscores this purpose in its brief:

> Because the system relies on self-reporting by Defendant, the Dealer Lease requires Defendant to maintain contemporaneous financial records of its operations, to give Chevron a way to verify that sales have been properly reported. The Dealer Lease also gives Chevron the right to audit those records, to make sure Defendant is in compliance with its obligations under the Lease. . . . [T]he requirement that Defendant keep contemporaneous records of its sales and make them available for audit permits Chevron to verify that the station's sales were properly reported and, therefore, the proper rent was charged

(Br. 3, 10 (internal citations omitted)).

On the instant motion, all evidence produced by defendant must be credited and all justifiable inferences in its favor must be made. *See Anderson*, 477 U.S. at 248, 255. The Dhillon declaration therefore must be accepted as proving that although defendant gave plaintiff the records late, the documents eventually were created using valid data, resulting in disclosure to Chevron of the required records. Based on this evidence, the Court at trial justifiably could conclude that Chevron eventually was able to verify rent amounts and suffered no significant harm as a result of the delay. The ability to verify rent is, after all, the very purpose of the audit and recordkeeping requirements. If the Court at trial were to conclude that Chevron suffered no significant harm, it also could conclude that the breaches were unimportant to the franchise relationship and therefore did not justify termination.

Of course, it is conceivable that Chevron could point to enough evidence to make these inferences in SSD's favor unreasonable. Chevron then would prevail on the instant motion. Chevron has submitted evidence that the records produced were deficient in certain respects. This evidence, however, is not so strong as to make it unreasonable for a finder of fact to infer, at trial and from Mr. Dhillon's testimony, that the lapses were not serious enough to undermine the franchise relationship.

Plaintiff points to the following evidence in support of its contention that the "records Defendant ultimately provided were worthless to verify the sales data" that previously had been reported automatically (Reply Br. 8).

6

*First*, there are two income statements for 2004 (Br. 15–16, Reply Br. 8–9).[3] One was provided to plaintiff by defendant's counsel. The other was provided by defendant's tax preparer (Ray Decl. ¶¶ 26, 32). There are differences between the statements. This raised a red flag that defendant might be maintaining double books in an attempt to defraud plaintiff. The Court held an evidentiary hearing at which plaintiff's bookkeeper and tax preparer, a certified public accountant, both testified. They both testified that one version of the income statement was a draft prepared by the bookkeeper and that the second was the final version submitted to the Internal Revenue Service after revisions by the tax preparer. This testimony was supported by a declaration submitted by the bookkeeper (Davis Decl. ¶ 3). The testimony and the bookkeeper's declaration create, at least, a material issue as to whether the differences between the two versions cast suspicion on their reliability, or are merely the result of fine-tuning by the CPA.

Plaintiff objects to the bookkeeper's statement that "it is a common practice for the CPA to make adjustments to finalize the tax returns." Plaintiff contends this statement lacked foundation because the bookkeeper stated she was not a CPA yet rendered "an opinion regarding 'common practice[s]' followed by CPAs" (Pl.'s Objections to Evidence Submitted by Def. at 4). The bookkeeper's statement did not refer to common practice among CPAs generally. She referred only to the common practice of the CPA who prepared defendant's tax returns. She had a foundation to make this statement because she worked with that particular accountant. The objection is overruled. Plaintiff also objects that the evidence is an improper opinion in violation of FRE 701 and 702. The bookkeeper's statement was not an opinion. It was a statement of a fact that she observed personally. These objections also are overruled.[4] In any case, the live testimony standing alone was enough to raise a triable issue of material fact.

---

[3] Plaintiff argued that there were two distinct income statements both for 2003 and for 2004. Only one income statement for 2003, however, was submitted into evidence with the motion. The argument about the 2004 statements is therefore unavailing. If plaintiff introduced it into evidence at the hearing, that was too late because it failed to give defense counsel any time to prepare a response.

[4] Plaintiff objects to evidence not mentioned in this order. The results of this order are based only on evidence mentioned in it. All objections to evidence not mentioned here are therefore moot.

7

*Second*, Chevron claims that the "order in which the documents were produced is inherently suspicious" (Reply Br. 9). Even if the order in which the documents were produced is suspicious, the Dhillon declaration meets this objection by stating that the documents were created from underlying source documents such as cancelled checks. His statement thus might give rise to a reasonable inference that the documents were reliable. The order in which the documents were produced does not overcome this inference.

*Third*, Chevron alleges that the "balance sheets are wrong and contain suspicious, unexplained entries" (*ibid*). Plaintiff's expert states that 2002 retained earnings were miscalculated on a balance sheet, although he states that it "is unknown at this time how this number was calculated." The same expert reports another apparent miscalculation that resulted in retained earnings for 2003 being underreported to the IRS by $106. If this miscalculation were fixed, "the balance sheet would not balance" (Ray Decl. ¶¶ 34–35). As the expert conceded, the first discrepancy is of unknown origin. It is therefore of limited value in undercutting the reasonableness of inferring, based on Mr. Dhillon's testimony, that defendant's documents eventually were produced properly. The second discrepancy, of $106, is too small to carry plaintiff's burden.

*Fourth*, Chevron notes that defendant's books contain a reference to a "suspense account" containing more than $1 million for each year from 2000 to 2004 (Reply Br. 9; Ray Decl. ¶ 37). Plaintiff's expert stated that a suspense account is normally temporary. He called its long and consistent balance "quite extraordinary" (Ray Decl. ¶ 37). Defendant provided no explanation for this fact. As an initial matter, the contents of the records from 2000 and 2001 are irrelevant, because the only stated basis for termination was the missing records for 2002 to 2005. Furthermore, given that all justifiable inferences on the instant motion must be drawn in defendant's favor, the unusual nature of the suspense-account item on the 2002 through 2005 balance sheets does not, in and of itself, render unreasonable the inferences that may be based on the Dhillon declaration.

*Fifth*, Chevron claims that defendant's balance sheets from 1999 to 2004 "claim inconsistent costs for fixtures and equipment[,] and depreciation expenses in excess of 100% of

8

1   the cost of the fixtures and equipment" (Reply Br. 9). The first inconsistency was in 1999 alone
2   (Ray Decl. ¶ 36). The termination of the franchise was based only on the failure to produce
3   documents covering 2002 through 2005 (Phelps Decl., Exh. B (Not. of Termination)). Plaintiff
4   provides no reason why a discrepancy from 1999 is relevant. Furthermore, Chevron's Rental
5   Accounting Guide only requires retention of documents for three calendar years (Phelps Decl.,
6   Exh. C (Rental Accounting Guide at 4-7). As to the depreciation exceeding the cost of the
7   fixtures and equipment, the difference is just $5,743 (Ray Decl. ¶ 37). This amount is too small
8   for it to overcome the justifiable inference, based on Mr. Dhillon's declaration, that the
9   documents defendant produced were reliable enough to allow proper calculation of rent owed.

10         *Sixth*, plaintiff notes that the ending value of the gas station's inventory for each year
11  was identical for 2002 through 2004 (Reply Br. 9; Ray Decl. ¶ 30). Plaintiff casts this
12  consistency as suspicious. SSD's bookkeeper states that the figures were "a[n] . . . estimate of
13  the Station's closing inventory for 2002–2004" (Davis Decl. ¶ 5).[5] Any inquiry into whether
14  the estimates were accurate and reliable enough to allow Chevron to verify the rent is a fact-
15  intensive inquiry. The answer to this question is in legitimate dispute. The bare suspicions of
16  Chevron's expert witness are therefore not enough to support a grant of summary judgment in
17  its favor. This is particularly true in light of Mr. Dhillon's declaration, which permits the
18  justifiable inference that the figures were reliable.

19         *Seventh*, plaintiff raises the contention that the "annual financial statements Defendant
20  produced are no substitute for the monthly financial statements required" by the franchise
21  agreement. Plaintiff argues that these annual statements are insufficient because rent is
22  calculated on a monthly basis (Reply Br. 10). The only evidence that Chevron cites in support
23  of this argument are sections 1(b)–(d) of the Optional Temporary Partial Rent Waiver and
24  Electronic Transaction Authorization Agreement (Phelps Decl., Exh. A). None of these
25  sections relate to recordkeeping. Instead, they address how rent is to be calculated.

---

[5] The bookkeeper characterized her estimates as "reasonable" (Davis Decl. ¶ 5). Chevron objects to her characterization of the figures as "reasonable," on the ground that this statement lacks foundation and is improper opinion testimony (Pl.'s Objections at 4). This order assumes, without deciding, that these objections would be sustained. It therefore considers the evidence with the word "reasonable" stricken from the declaration.

9

Furthermore, plaintiff cites to no evidentiary support for its contention that SSD supplied it only with annual statements. These evidentiary deficiencies defeat this aspect of Chevron's motion. In addition, Chevron did not raise this issue until its reply brief. New issues may not normally be raised in a reply brief.

Even considered as a whole, Chevron's contentions about discrepancies and irregularities in defendant's records would not make it unreasonable for a finder of fact to find for defendant based on Mr. Dhillon's testimony. The Court at trial reasonably could reject plaintiff's objections as a potpourri of quibbles that would not undermine the franchise relationship enough to warrant termination. Chevron may, however, prove its case at trial. At this stage, however, there is a sufficient factual dispute to bar summary judgment on the issue of Chevron's entitlement to terminate the franchise.

Chevron also raises a legal argument related to the records that were produced late. It claims that defendant "has no right to cure its breaches" (Reply Br. 7). The dispositive issue, however, is not whether defendant cured breaches of the agreement. Instead, the issue is whether those breaches were significant enough to justify terminating the franchise. Under the Act, dealers do not need to cure unimportant and merely technical breaches of the franchise in order to avoid termination. If the breaches are that insignificant, termination is barred and any right to "cure" is a nonissue.

Chevron cites *Wisser Company, Inc. v. Mobil Oil Corp.*, 730 F.2d 54 (2d Cir. 1984). In *Wisser*, a gasoline dealer brought an action seeking to enjoin Mobil from completing termination of the franchise. Mobil had based its termination on the dealer selling non-Mobil gasoline under the Mobil trademark. A district judge denied a motion for a preliminary injunction, based on its findings that there was a probability that Mobil would be able to prove that the dealer was selling misbranded gasoline and that Mobil would succeed on the merits. The Second Circuit upheld the order, holding that "the district court's finding that Mobil probably would be able to show at trial that [the dealer] was 'passing off' the non-Mobil gasoline as Mobil gasoline is not clearly erroneous . . . ." The dealer argued that the notice of termination was improper because it was not preceded by an earlier notice and by an

10

1  opportunity to cure the breach.  The Second Circuit held that there was no such right to an
2  opportunity to cure under 15 U.S.C. 2802(b)(2)(A).  *Wisser Co.*, 730 F.2d at 56–59.  In the
3  instant motion, Chevron justifies its termination on the same subsection of the Act.  Beyond
4  that, the similarities end.  SSD makes a different contention than did the dealer in *Wisser*.  SSD
5  does not contend that it was entitled to an earlier notice and to an opportunity to cure before a
6  notice of termination could be given.  Instead, SSD contends that its breach never rose to the
7  level of importance that would justify termination.

8       Chevron also cites *Reyes v. Atlantic Richfield Co.*, 12 F.3d 1464 (9th Cir. 1993), in
9  support of its statement that "courts have repeatedly upheld terminations under the [Act] based
10 on the dealer's failure to maintain business records required by the franchisor (Br. 12).  In
11 *Reyes*, the Ninth Circuit held that three facts, collectively, justified nonrenewal of the dealer's
12 franchise: (1) the dealer stopped stocking the store with new merchandise, (2) the dealer let
13 required insurance lapse and (3) defendant failed to keep and produce proper records on time.
14 That decision, however, was distinguishable from the instant case in one crucial way:  unlike
15 SSD, the dealer in *Reyes* did not claim that the records were ever produced to Atlantic
16 Richfield.  He therefore made no argument that the net result was a mere delay, as opposed to
17 an unmitigated failure to keep proper books.  His only argument that termination was not proper
18 under section 2802(b)(2)(A) was that it was motivated by racial discrimination.  12 F.3d at
19 1468–69.  *Reyes* is therefore not on point.

20      Chevron also cites to two district court orders.  The first, in *Chevron, U.S.A. Inc. v.*
21 *Gulessarian*, Bus. Franchise Guide (CCH) ¶ 11,975 (C.D. Cal. Nov. 22, 2000), is
22 distinguishable because defendant produced nothing to contradict Chevron's evidence that the
23 dealer's bookkeeping was improper.  As the judge ruled:

> Defendant argues that termination [under section 2802(b)(2)(A)] was not warranted because Plaintiff failed to provide Defendant an opportunity to produce the requested records 'and filed the subject action in bad faith.'  Plaintiff correctly notes that the only evidence Defendant offers with respect to the audit is a declarant's statement that the auditor spent one-and-a-half hours at the station on August 17, 1999.  This is wholly insufficient to support Defendant's conclusory argument.

*Id.* (internal citations and footnote omitted). By contrast, SSD produced evidence that the documents it eventually delivered to Chevron were prepared using proper underlying data. A reasonable finder of fact could infer from this evidence that Chevron eventually could verify the rent and, therefore, that SSD's breaches were unimportant to the franchise. In addition, the judge in *Gulessarian* held that the termination was justified under section 2802(b)(2)(A) based on filing of false sales tax returns. *Id.* n.4. In the instant motion, by contrast, Chevron does not pursue this justification for termination of the franchise. In short, *Gulessarian* does not persuade the Court to grant Chevron's motion.

The other district court order was in *Nahabet v. Chevron U.S.A., Inc.*, Bus. Franchise Guide (CCH) ¶ 12,184 (C.D. Cal. Oct. 24, 2001). Like *Gulessarian*, *Nahabet* was a case over a dealer's unmitigated failure to provide important accounting documents to Chevron. As the judge in *Nahabet* noted, "[I]t is undisputed that the missing Z Reports [summary sales reports generated by the station's automatic sales-reporting system] were either discarded or never generated, and that Plaintiff never produced them; thus, Plaintiff was in no position to cure his breach." *Id.* & n.2. *Nahabet* therefore is distinguishable from the instant case, in which SSD presents evidence that it eventually gave Chevron all the records it requested. Given this important difference between the instant case and *Nahabet*, that order does not persuade the Court to grant Chevron's motion.

## CONCLUSION

For the reasons stated, plaintiff's motion for summary judgment is **GRANTED** only as to whether defendant breached material terms of the agreement. In all other respects, including plaintiff's entitlement to terminate the franchise, the motion is **DENIED**.

**IT IS SO ORDERED.**

Dated: July 21, 2006

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

12