IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHEVRON U.S.A. INC., | No. C 05-03276 WHA |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL** |
| SSD & ASSOCIATES, | |
| Defendant. | |

**INTRODUCTION**

Plaintiff Chevron U.S.A. Inc., commenced this action to terminate the dealership of defendant SSD & Associates covering a Chevron-brand station in San Ramon. After partial summary judgment was granted in favor of Chevron, the remainder of this action was tried to the Court on August 21–23, 2006. This order includes the findings of fact and conclusions of law. The record is cited only in those instances that may be of particular assistance to the court of appeals.

**FINDINGS OF FACT**

1. Defendant SSD & Associates began leasing a Chevron-branded service station at 2860 Crow Canyon Road in San Ramon, California, from Chevron in 1994. The most recent renewal was in 2002. Surinder Dhillon has been the owner of SSD at all relevant times.

2. Pursuant to the written dealer agreement (TX 2), SSD has been required at all material times to pay monthly rent, which has been based on specified percentages of the

monthly gasoline gross profits and upon convenience store gross sales minus sales taxes. SSD has also been required to pay a separate rent for the automotive service-bay portion of the station based upon the monthly automotive service-bay gross sales less sales taxes.

3. An electronic point-of-sales "cash register," called "EPOS" by the parties, has been used to track the base sales for rent. Chevron has provided the EPOS system to its dealers. Chevron, however, needs the ability to verify that all sales are in fact run through the EPOS; otherwise, a dealer might cheat Chevron by diverting some sales outside the EPOS, such as a cash transaction with the cash simply going in the dealer's pocket.

4. Therefore, Section 4(d) of the dealer lease has provided at all material times (TX 2):

> Dealer shall maintain such books and records relating to Dealer's operation of the Premises as may be specified by Chevron from time to time in Chevron's Rental Accounting Guide and such other written instructions as Chevron may from time to time provide to Dealer. . . . Dealer acknowledges receipt of Chevron's Rental Accounting Guide.

5. In turn, the rental accounting guide has provided (TX 3 at page 4-1):

> In order to make the audit process discussed in the Audit section of this Guide quick and easy, it is necessary to have consistency in the way your records are maintained. If the records are not properly organized and properly stored, it could cost you a great deal of time and money to gather the information needed for your periodic audits by Chevron. The better your records are kept, the quicker the audit can be conducted and concluded.
>
> The records should be organized in the manner described in this section.

6. Section 4(d) of the dealer lease has also provided:

> In order to confirm Dealer's performance of Dealer's obligations under this Lease, Chevron shall have the right at any time upon 72 hours' notice to Dealer to audit all books and records relating to Dealer's operation of the Premises. . . . Dealer shall within the time specified in any such notice, produce such books and records for inspection and/or copying by Chevron.

7. Page 6-1 of the rental accounting guide has provided:

> During the term of your Dealer Lease, you will be periodically audited. This audit will serve to validate the data provided from your facility and can also provide you with an opportunity to identify potential problems. . . . Audits that reveal reporting

2

> discrepancies or other breaches of your Dealer Lease may result in termination of your Dealer Lease.

8. Although the dealer agreement and rental accounting guide are complicated and interlocking, both were received by SSD and were presumably reviewed by SSD. No contention is made that SSD was not fairly apprised of its obligations at issue herein.

9. In 1998, Chevron opened a competing station about a mile away in San Ramon. Thereafter, SSD's profitability declined. Starting in 1999 and thereafter, including a written offer in 2001, Chevron offered to buy out SSD. This included a written offer for approximately what SSD had paid in 1994 (*e.g.*, TX 34). At least some of these offers were in response to SSD's solicitations.

10. Surinder Dhillon was also involved with his brother in a Chevron station in nearby Pleasant Hill. That station was the subject of litigation in state court resulting in a judgment against Chevron in the amount of $2,269,087 plus attorney's fees. The judgment was affirmed in 2004. Although his brother and not Surinder Dhillon himself was the named plaintiff in that litigation, he was mentioned in the appellate opinion. It seems obvious that Chevron was aware that Surinder Dhillon was involved in that litigation. Surinder Dhillon, for example, was deposed in that action. Surinder Dhillon was present each day at trial and participated in the mediation. The same litigation attorney (Robert Phelps) was Chevron's attorney in that case as well as the instant action.

11. SSD failed to file its state and federal income tax returns for the years 2002, 2003 and 2004. No extension to file was obtained so far as the record shows. SSD admits this. At trial, Mr. Dhillon blamed Chevron, saying SSD was under pressure from the other lawsuit. This argument was conclusory and wholly undeveloped at trial. Even after winning the other lawsuit, Mr. Dhillon made no efforts to file the returns. This order rejects the bald allegation that Chevron somehow prevented SSD from filing its tax returns or, for that matter, complying with its record-keeping obligations under the dealer agreement. SSD deliberately ignored its federal and state tax obligations for three years running. This finding is important to the outcome of this action.

3

12. Chevron had no knowledge of these failures until March 2005 when it received a document demand from the California Franchise Tax Board ("FTB"), the state analogue to the federal Internal Revenue Service. More specifically, on or about March 21, 2005, Chevron received an FTB demand requiring it to furnish information as to the names, addresses and account numbers of all banks/financial institutions that the taxpayer used in his business dealings with Chevron, including banks used for electronic fund transfers, security deposits, payments for inventories, rent and the like.

13. After receiving this demand, Chevron asked Mario Oseguera, an outside CPA who regularly performed such audits for Chevron, to conduct an audit of SSD. The dealer agreement, as stated, required the dealer to submit to "periodic" audits to validate the EPOS data. This was, however, the first time that SSD was to be audited by Chevron.

14. On May 9, 2005, Chevron sent a letter notifying SSD that on the following May 27, the auditor would visit and review seventeen categories of items, all of which were to be assembled and ready to review. The list demanded was extensive. The list included many variants of EPOS daily, shift and journal, tapes and reports, all work orders stored in numerical or chronological sequence, purchase invoices and journals summarizing them on a monthly basis, profit-and-loss statements, income statements, operating statements, balance sheets and federal and state income tax returns related to the business, including all source documents for such statements, among many other items (TX 21).

15. On the appointed day — May 27 — Auditor Osequera reviewed various items produced by SSD, as requested. Mr. Dhillon, however, told him that SSD had not filed federal or state income tax returns for years 2002–04 and had not prepared summary financial statements for that period either. Nor could SSD provide purchase journals summarizing monthly food-mart inventory purchases. Auditor Oseguera told Mr. Dhillon that Chevron would get back to him concerning the missing records.

16. SSD did produce its state sales-tax returns, among other records. These showed that SSD reported slightly higher sales to Chevron via the EPOS system than it had reported for sales-tax purposes. No discussion about this discrepancy occurred during the field work,

4

however. Auditor Oseguera did not ask SSD for any explanation. Had he done so, he would have learned that the sales-tax returns were accurate (despite Chevron's contrary accusation later) and that SSD had *over*reported this aspect of the rental base to Chevron (due to the fact that EPOS included the sales tax itself as part of the sale).

17. On June 20, 2005, Auditor Oseguera provided his report to Chevron (but not to SSD). It stated in part (TX 10):

> In summary, the Dealer did not provide the following accounting books and records required by the Dealer Lease Agreement:
>
> • Profit & Loss Statements, Income Statements and Financial Statements for the calendar years ended December 31, 2004, 2003 and 2002.
>
> • Purchase Journals to summarize monthly food mart inventory purchases.
>
> • Federal and State Income Tax Returns for the calendar years ended December 31, 2004, 2003 and 2002.

18. As a result, the report stated that the auditor had been unable "to calculate the Food Mart Sales Gross Profit Margins." The report stated that "the Dealer has not prepared Profit & Loss Statements, Income Statements and Financial Statements for the calendar years ended December 31, 2004, 2003, and 2002, and did not provide purchase journals to summarize monthly food mart inventory purchase . . ." (TX 10 at CHEV00496). The auditor stated that he had tried to compare the EPOS sales against sales reported for federal and state income-tax purposes but was stymied in doing so by the lack of any such returns for 2002–04.

19. The auditor stated that he had been able to review the dealer's sales-tax returns. As stated, these showed that SSD had been reporting *more* sales to Chevron for rent purposes than had been reported for sales-tax purposes, although only by a small percentage.

20. Chevron then convened an internal meeting to discuss whether to terminate SSD. The meeting was sometime before August 9 but the date is unfixed by the record. At the meeting were Norman Norris, Chevron's Manager of Retail Programs; Kent Cowan, Financing and Relationship Coordinator; David Cohen, Chevron's in-house counsel; and Bruce McDiarmid, counsel with the same firm as Chevron's trial counsel herein. Auditor Oseguera was present for the first part of the meeting. SSD was not invited.

5

21. At the meeting, Auditor Oseguera's report was reviewed. The auditor was then excused. A discussion then took place. Based on what he heard and read at the meeting, Mr. Norris testified at trial that he and he alone made a decision to terminate SSD. He did not, however, prepare a contemporaneous memorandum explaining his reasons. What he heard at the meeting is largely unknown because Chevron asserted an attorney-client privilege as to anything said by counsel in the meeting. He did admit, however, that he learned at the meeting that Surinder Dhillon had participated in the prior litigation against Chevron (Tr. 343). The details on that topic, however, were cloaked in the attorney-client privilege (Tr. 344).[1]

22. Be that as it may, Chevron then hand-delivered a notice of termination to SSD dated August 9, 2005. The notice was prepared by counsel. The delivery happened on August 10, 2005. The notice recited that Auditor Oseguera had tried to audit the station but SSD had failed to produce certain business records. In part, the letter stated (TX 10):

> You failed to produce to the auditor, for various time periods covered by the audit, the following business records which your Dealer Lease requires you to maintain and produce for audit:
>
> • Purchase Journals summarizing monthly food mart inventory purchases for 2002, 2003 and 2004.
>
> • Profit and Loss Statements, Income Statements and Financial Statements for 2002, 2003 and 2004.
>
> • State and federal Income Tax Returns for 2002, 2003 and 2004.
>
> Without these records, which are required by your Dealer Lease, it was impossible for the auditor to determine if you have been paying the correct amount of rent to Chevron. Your failure to maintain or produce the records identified above is a breach of section 4 of your Dealer Lease. Your failure to maintain such records also violates Internal Revenue Code section 6001 (and is a criminal violation under Internal Revenue Code section 7203) and California Revenue and Taxation Code section 7053 and the regulations issued under each of these statutes.

---

[1] Although Chevron advances Mr. Norris as "the" decisionmaker and argues that his reasons and analysis are controlling, this order has cast a wider gaze in assessing Chevron's reasons for termination. An organization may have one decisionmaker but his or her decision is usually informed by recommendations and input from subordinates and advisors. The trier of fact is free to look beyond potentially self-serving, after-the-fact statements of reasons by a supposed sole decisionmaker and to assess all of the surrounding facts and circumstances.

6

> In accordance with section 4(d) of your Dealer Lease, demand is hereby made for Chevron's audit fees of $2,400 incurred in connection with the attempted audit on May 27.

23. The letter further stated:

> You advised the auditor that you have not filed either state or federal income tax returns for 2002, 2003 or 2004. Your failure to file your federal income tax returns is a criminal violation of Internal Revenue Code section 7203. Your failure to file your state income tax returns is a criminal violation of California Revenue and Taxation Code section 19701.
>
> The California Secretary of State placed you on "suspended" status, effective September 1, 2004. Your continued operation of your business after such suspension is a criminal violation under California Revenue and Taxation Code section 19719(a).

24. The letter also stated that SSD had committed fraud in underreporting its sales to California. This was based solely on the fact that the EPOS sales reported to Chevron were slightly higher than those reported in the sales-tax returns. Specifically, the notice stated:

> The auditor also noted significant differences between the net sales you reported to Chevron through your Electronic Point-of-Sale Terminal ("EPOS") terminal and those you reported on your state sales tax returns. Specifically, the auditor determined:
>
> - For 2002 you recorded $27,864 more in sales through your Chevron EPOS terminal than you reported on your state sales tax returns.
>
> - For 2003 you recorded $4,225 more in sales through your Chevron EPOS terminal than you reported on your state sales tax returns.
>
> - For 2004 you recorded $11,194 more in sales through your Chevron EPOS terminal than you reported on your state sales tax returns.
>
> You did not provide a reasonable explanation to the auditor why your net sales reported to Chevron through the EPOS terminal were so much higher than those reported on your state sales tax returns. As a result, Chevron must conclude that you have failed to report all of your sales and income to the relevant taxing authorities and that your failure to do so was fraudulent.

25. Based on the foregoing, the letter stated that Chevron was terminating SSD for failure to maintain records required by the dealer lease, for failure to comply with the law, for

7

criminal misconduct, and for unlawful, fraudulent and deceptive unreporting of all sales for tax purposes. Specifically, the notice stated:

> Chevron's termination of your Dealer Agreement is authorized by the following provisions of your Dealer Agreements:
>
> 1. Your failure to maintain the records required by your Dealer Lease authorizes its termination under section 7(b)(1) of the Dealer Lease.
>
> 2. Your failure to comply with the law in (a) failing to maintain the business records required by law, (b) failing to file state and federal income tax returns, (c) failing to report all of your sales and income to the relevant taxing authorities, and (d) continuing to operate your business after suspension by the California Secretary of State, breaches section 2(c)(10) of your Dealer Lease and section 2(b) of your Dealer Supply Contract and authorizes their termination under sections 7(b)(1) and 7(b)(4) of the Dealer Lease and sections 7(b)(1) and 7(b)(4) of the Dealer Supply Contract.
>
> 3. Your criminal misconduct (a) in continuing to operate your business after suspension by the California Secretary of State, (b) in not filing your income tax returns in violation of both federal and state tax statutes, (c) in not maintaining the business records required by law, and (d) in not reporting all of your sales to the relevant taxing authorities, authorizes termination of your Dealer Lease under section 7(b)(8) of the Dealer Lease and termination of your Dealer Supply Contract under section 7(b)(8) of the Dealer Supply Contract.
>
> 4. Your unlawful, fraudulent and deceptive failure to report all of your sales to the relevant taxing authorities authorizes termination of your Dealer Lease under section 7(b)(8) of the Dealer Lease and termination of your Dealer Supply Contract under section 7(b)(8) of the Dealer Supply Contract.

26. The notice also enclosed a summary of statutory rights prepared by the Department of Energy. SSD concedes that in form the notice of termination met all statutory requirements. SSD was not given any opportunity to cure or to answer these accusations before the notice but it is conceded that the grounds asserted do not require any such opportunity under the relevant law.

27. One day after the notice was hand-delivered, this civil action was commenced by Chevron to terminate SSD on August 11, 2005. From this point forward, all relevant communication between the parties were between counsel.

8

28.     The FTB had suspended SSD's corporate franchise in September 2004, presumably giving notice to SSD at that time. Prior to the termination notice in May 2005, SSD had taken no steps to file any returns or to reinstate its corporate franchise.

29.     After the termination notice and lawsuit, SSD immediately began to prepare and to provide the missing records and returns. SSD retained a bookkeeper, Gay Davis, and a CPA, Mel Maltzman, who prepared annual financial statements and the tax returns. The tax returns were then filed. The FTB issued a certificate of revivor on September 15, 2005. The total taxes reported for all these years was at least $2400. Chevron has alluded to some $40,000 in back taxes being owed but, on examination at trial, that figure pertained to an earlier era, not 2002–04.

30.     SSD provided copies of the missing tax returns to Chevron (through counsel) on September 15, 2005, copies of the missing financial statements by October 31, 2005, and the missing purchase journals by December 9, 2005. There are some estimates and curious line items in the financial statements, such as a large "suspense" account listed under assets. Some underlying records went missing before the scramble to prepare the documents. Very likely the statements would have been more reliable had they been prepared in a timely manner. Chevron, however, has not shown that there was any underpayment of rent or that the tax returns as filed were inaccurate.[2]

31.     The notice of termination included some exaggerated accusations. *First*, the accusation that SSD had reported more sales to Chevron than to the sales-tax authorities proved to be nothing more than an innocent error of overreporting sales to Chevron (to its benefit) due to the fact that Chevron's EPOS system erroneously included the sales tax itself as part of the sale. This "fraud" accusation (based on Chevron's own erroneous system) was unfair. *Second*, the notice accused SSD of "criminal" violations of law, namely the failure to file tax returns and the ongoing operation of the station despite SSD's "suspended" corporate status, and the alleged underreporting of sales for sales-tax purposes. No criminal proceedings have been brought

---

[2] During the summary judgment phase of the case, Chevron maintained that SSD had been maintaining two different sets of books, one to pay rent and another for other purposes. This "double set of books" accusation proved to be based on nothing more than an innocent intermediate draft that — as a draft — had somewhat different line items before adjustments to the final. There was no double set of books.

9

1 against SSD, however, so far as the record shows. To the contrary, the FTB reinstated SSD's
2 corporate powers in September 2005, one month after this action was commenced.

3     32. On the other hand, the notice correctly maintained that SSD had failed to prepare
4 and file state and federal income-tax returns for 2002–04, had failed to maintain the financial
5 statements required for 2002–04, and had failed to maintain the purchase journals summarizing
6 monthly food-mart inventory purchases for 2002–04.

7     33. For all the record shows, Chevron has been paid all the rent due. Chevron's
8 point, however, is that the failure to timely maintain the required records frustrated the
9 verification process and drew into question the integrity of the dealer. Chevron argues, in effect,
10 that it should not have to continue on with a dealer who has intentionally violated his federal and
11 state tax obligations for three years running, among other things.

12     34. In addition to the foregoing, this order adopts all stipulated facts and adopts all
13 proposed post-trial findings to the extent (and only to the extent) expressly admitted by the other
14 side in its response thereto.

## ANALYSIS

This action arises under the Petroleum Marketing Practices Act of 1978, 15 U.S.C. 2801, et seq. The Act was passed to protect dealers from "arbitrary or discriminatory termination or nonrenewal of their franchise." S. Rep. No. 731, 95th Cong., 2d Sess. 15 (1978). To this end, the Act limits the grounds for termination. The Ninth Circuit has summarized the bases allowed by the Act for termination:

> The PMPA approves three main circumstances where non-renewal or termination is justified. First, the franchisee could lose his or her franchise for failing "to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship." 15 U.S.C. § 2802(b)(2)(A). Second, termination or non-renewal is justified if the franchisee fails to make a good-faith effort to carry out any provision of the contract "without consideration of the reasonableness of the term as long as the franchisee is given an opportunity to comply with the term in question." *O'Shea v. Amoco*, 886 F.2d 584, 595; *See* 15 U.S.C. § 2802(b)(2)(B). Finally, the termination or non-renewal is also justified upon "the occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or non-renewal of the franchise relationship is reasonable." 15 U.S.C. § 2802(b)(2)(C). The PMPA provides a

10

> non-exhaustive list of examples of such occurrences under sub-section (C) including fraud or criminal conduct by the franchisee, and failure by the franchisee to make timely payments of sums owing to the franchisor. 15 U.S.C. §§ 2802(c)(1), 2802(c)(8).

*Reyes v. Atlantic Richfield Co.*, 12 F.3d 1464, 1468 (9th Cir. 1993).

In the instant action, Chevron relies upon the first and third avenues for termination. (The second avenue contemplates notice and opportunity to cure, which concededly was not provided here.)

### 1.  SECTION 2802(b)(2)(A) — BREACH OF AGREEMENT.

The first asserted avenue for termination under the Act is Section 2802(b)(2)(A), "failure to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship."

Caselaw within our circuit includes numerous decisions involving attempted terminations of franchise agreements under the PMPA. With respect to attempted terminations based upon failures to comply with tax obligations and/or failures to maintain agreed upon financial records, the caselaw is divided. In some cases, the terminations were upheld; in others, they were not. Also relevant to the outcome of these decisions has been the procedural posture, *i.e.*, whether the issue was determined by summary judgment rather than by trial.[3]

---

[3] Decisions sustaining terminations for failures to comply with tax obligations include: *Chevron U.S.A., Inc. v. Gulessarian*, Bus. Franchise Guide (CCH) ¶ 11,975 (C.D. Cal. Nov. 22, 2000) (unpublished opinion) (granting summary judgment for franchisor where franchisee underreported convenience store sales tax returns); *Sinjar Mktg., Inc. v. Atlantic Richfield Co.*, No. 98-5150 CM (C.D. Cal. Nov. 13, 1998) (granting summary judgment for franchisor where franchisee failed to report wages or withhold taxes for employees). Decisions rejecting terminations for failures to comply with tax obligations include: *Chevron U.S.A., Inc. v. El-Khoury*, 285 F.3d 1159 (9th Cir. 2002) (reversing summary judgment for franchisor because materiality of the franchisee's underpayment of sales taxes was a triable issue of fact when: (i) franchisor could not prove harm, (ii) franchisor removed provision allowing for audits of franchisee's tax records from final dealer agreements, and (iii) franchisee remedied his tax violation; on remand, termination rejected due to insufficient evidence of materiality); *Chevron U.S.A., Inc. v. Lutz*, 271 F. Supp. 2d 1196 (N.D. Cal. 2003) (granting franchisee's motion for partial summary judgment because evidence was insufficient to establish franchisee's *intentional* violation of federal and state law) (emphasis added); *Chevron U.S.A., Inc. v. Mebtahi*, 148 F. Supp. 2d 1019 (C.D. Cal. 2000) (granting summary judgment for franchisee where franchisee failed to report sales tax only after relying on tax accountant's advice and had overpaid sales taxes in prior years and was due a net refund). Decisions sustaining terminations based upon failures to maintain agreed upon financial records include: *Reyes v. Atlantic Richfield Co.*, 12 F.3d 1464 (9th Cir. 1993) (affirming summary judgment for franchisor and upholding termination where franchisees failed to maintain "accurate and up-to-date" financial records, allowed the insurance policies to lapse, and ceased stocking new goods); *Nahabet v. Chevron U.S.A., Inc.*, Bus. Franchise Guide (CCH) ¶ 12,184 (C.D. Cal. Oct. 24, 2001), *aff'd* 49 F.App'x 723 (9th Cir. 2002) (unpublished opinion)

1     Chevron has concededly proven that SSD breached the franchise agreement by failing
2 to maintain the financial records and the income-tax returns. Whether the requirement was
3 "reasonable and of material significance to the franchise relationship" is the main question.
4 The exhaustive list of records Chevron requires is so daunting that it will be inevitable that
5 dealers will fall below perfection in their paperwork. Minor shortfalls must be tolerated.
6 That said, Chevron has a legitimate need to backstop and audit the EPOS system and rent paid
7 thereon. Requiring the annual financials, income-tax returns, and monthly purchase journals as
8 a cross-check source was a reasonable requirement, given the legitimate need for audit sources.
9 *Nahabet v. Chevron U.S.A., Inc.*, Bus. Franchise Guide (CCH) ¶ 12,184 (C.D. Cal. Oct. 24,
10 2001), *aff'd* 49 F.App'x 723 (9th Cir. 2002).

11     Rent goes to the heart of the relationship. The documentation requirement was
12 reasonable and material to the relationship. Here, the breach was not a minor or accidental lapse.
13 It was a three-year intentional omission of important audit records. Any dealer who ignores his
14 federal and state tax obligations for three years running poses a material risk of cheating his
15 franchisor on his rent obligation. Therefore, this order concludes that SSD violated its
16 agreement and that the provision violated was reasonable and of material significance to the
17 franchise relationship.

18     **2.    SECTION 2802(b)(2)(C) — OCCURRENCE OF EVENT.**

19     The second asserted avenue for termination under the Act is Section 2802(b)(2)(C),
20 *i.e.*, an event "which is relevant to the franchise relationship and as a result of which
21 termination of the franchise or nonrenewal of the franchise relationship is reasonable."
22 Section 2802(c) provides a nonexclusive list of examples, including:

>     (1)     [F]raud or criminal misconduct by the franchisee relevant
> to the operation of the marketing premises.
>
>                     *       *       *

---

(granting partial summary judgment for franchisor where franchisee failed to maintain group sales "Z-reports" as required by the Rental Accounting Agreement); *Chevron U.S.A. Inc. v. Gulessarian*, CCH Bus. Franchise Guide ¶ 11,975 (C.D. Cal. Nov. 22, 2000) (termination sustained where franchisee failed to maintain and produce particular books and records in addition to underreporting sales tax returns). There are no decisions within the circuit rejecting terminations based upon failures to maintain agreed upon financial records.

12

> (11) Knowing failure of the franchisee to comply with Federal, State or local laws or regulations relevant to the operation of the marketing premises.

*Chevron U.S.A., Inc. v. El-Khoury*, 285 F.3d 1159, 1163 (9th Cir. 2002), held that the word "failure" as used above in Subsection 11 imported the definition of "failure" used elsewhere in the Act and thus excluded "technical or minor violations," such that a prohibited failure must be one that is "so serious as to undermine the entire relationship." This is a high standard.

That said, this order holds that SSD's knowing failure for three years running to file its income taxes at both the state and federal levels was so serious as to undermine the "entire relationship." The obligation to file income tax returns is an important duty in America. Any dealer who knowingly fails his country and state on his tax obligations for three years running presents an undue and material risk of failing his franchisor on rent and otherwise. No franchisor should be compelled to maintain such an untrustworthy violator as its franchisee.

To be sure, *El-Khoury* held that the issue of materiality and importance of an underpayment of sales taxes by $15,000 should been have adjudicated by trial rather than by summary judgment. Here, however, a trial *has* been held. The Court has inquired into the significance of the violation to see whether it was only technical or unimportant to the franchise relationship. The Court finds that SSD's recalcitrance in not filing income-tax returns for three years was so serious as to undermine the entire relationship, especially given that the relationship depends in large degree on trust, particularly trust to pay the correct amount of rent.[4]

It is true that *after* being caught in violation, SSD prepared and filed tax returns and prepared versions of the missing records. While there is no right to cure, *El-Khoury* teaches that the Court must take into account — in assessing the materiality of the violations — the facts and circumstances of the after-the-fact fix. The undersigned has done so. It is true that SSD managed to file its returns and get reinstated in short order. But the violations were so persistent

---

[4] Unlike *El-Khoury*, no Chevron executive here testified that the defaults here involved would be only between the dealer and the government or testified he or she "did not know" what harm Chevron would suffer. 285 F.3d at 1164. Here, by contrast, Mr. Norris explained the various ways the defaults would harm Chevron.

13

1  for so long — at both the federal and state levels — as to be inexcusable. That no "fix" was
2  attempted until after Chevron discovered the violation is most troubling. That SSD had no
3  plausible excuse whatsoever and tried lamely to blame Chevron draws its business ethics into
4  severe question. The circumstances here are more egregious than the mere underpayment
5  involved in *El-Khoury*.

\*          \*          \*

It is true that Chevron has failed to prove all of the grounds set forth in its notice. Most notably, it utterly failed to prove that the dealer had underpaid its state *sales* taxes. The truth was that it *had* paid them properly and even possibly *over*paid Chevron rent. This was because Chevron's own EPOS system larded sales tax into the base for the rent calculation. This poses the question of whether Chevron must prove *all* of the grounds asserted in the notice. The Ninth Circuit has not ruled on this issue. Other circuits have held uniformly that the franchisor need not prove up all grounds in the notice. This order will follow the uniform circuit authority on this issue.[5]

### 3. PRETEXT.

The Ninth Circuit holds that even when a valid ground for termination is proven, the oil company still loses unless it also proves that it was "the ground" for termination rather than, as alleged here, a mere pretext for a nefarious motive. In *Reyes*, the Ninth Circuit stated:

> We need not decide, however, whether the PMPA imposes an
> implicit good faith requirement in section 2802(b)(2)(A) for
> under the explicit language of the statute a franchisor must not
> only show that there was a legitimate reason for the termination or

---

[5] Decisions sustaining terminations where the franchisor proves only one of several grounds for termination include: *PDV Midwest Refining, L.L.C. v. Armada Oil & Gas Co.*, 305 F.3d 498 (6th Cir. 2002) (holding that notice of a legitimate ground for termination is not made ineffective by defective notice for additional grounds for termination); *Thompson v. Amoco Oil Co.*, 903 F.2d 1118 (7th Cir. 1990) (vacating and remanding with instructions that the district court need only consider one of the franchisor's asserted grounds for termination or non-renewal since the PMPA requires only one valid justification); *Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565 (11th Cir. 1987) (concluding that summary judgment for Chevron was proper where Chevron proved two of its five alleged grounds for termination and holding that a franchisor need prove the occurrence of only one of the grounds for termination under the PMPA to be entitled to summary judgment).

14

>non-renewal, he must also demonstrate that this reason was in fact
>the ground for the termination or non-renewal decision.

*Id.* at 1469.

It deserves repeating: *Reyes* holds that even if a legitimate violation is proven, as here, the franchisor must *also* prove that "[t]his reason was in fact the ground for the termination." As *Reyes* said, the franchisor is "only half done" by proving the breach, for it must also prove that the termination "*is based upon*" the ground asserted (emphasis in original). The second half of the franchisor's burden can be met by introducing evidence that the nonrenewal was in fact based on the breach. *Reyes* then concluded that the franchisee could offer evidence to rebut. But the burden of persuasion is always on the franchisor to prove that the stated reason was the real reason. This leads to the possibility that a legitimate and proven ground for termination can be trumped by a franchisor's inability to prove the real reason for the termination.

Applying *Reyes* here, it is true that Mr. Norris testified that the reasons for the termination were those set forth in the notice. On the other hand, Chevron invoked the attorney-client privilege to such an extent that the reasons and motives actually expressed at the all-important decisional meeting (before August 9) remain shrouded in mystery. This order assumes that the invocation of the privilege was legitimate, as SSD concedes (Reply Br. at 1). But the fact remains that its invocation has prevented the trier of fact from learning the motives as expressed at the decisional meeting itself. This leaves the record thin and conclusory as to the communications leading up to the decision to terminate.

For its part, SSD has provided evidence that Chevron viewed SSD as a painful thorn in its side and was hankering for a way to get rid of SSD. Chevron had erected a station about a mile away. They competed (but to an extent not so clear). Such competition as there was could have been eliminated, of course, by Chevron either buying out SSD or, if that failed, terminating SSD. In fact, various buy-out offers were made to SSD from 1999 through 2004 (*e.g.*, TX 34), although at least some were merely in response to SSD's solicitation of an offer. On a more contentious front, Chevron, Mr. Norris, and its counsel all knew that Surinder Dhillon was part of a hostile lawsuit against Chevron over a different dealership in Pleasant Hill. In that suit, Chevron was found guilty of bad faith. The case went to a jury verdict of $2.7 million.

15

That verdict was affirmed on appeal in 2004. Litigation counsel in *this* case took the deposition of Surinder Dhillon in *that* case. The very subject of the bad-faith suit came up at the decisional meeting itself, as Mr. Norris conceded (Tr. 343). When the FTB document demand came in 2005, Chevron and its legal team immediately sent in its auditor (after eleven years of no "periodic" audits at all of SSD).

Chevron then lept to false conclusions and accusations about "criminally" false sales-tax returns, when it was, to the contrary, Chevron's own EPOS system that created the discrepancy. Chevron gave SSD no effective opportunity to be heard to explain the discrepancy or to respond to any of the other charges before firing off its notice of termination. Although it was not required by the Act to afford such an opportunity, these circumstances indicate that Chevron was hell-bent on terminating SSD. Chevron has not persuaded the Court that the failure to maintain records and income-tax returns was its only reason.[6]

### 4.   MIXED MOTIVE.

This order finds that Chevron had two grounds for the termination — those asserted by Chevron *and* those asserted by SSD, the latter being beyond the pale of the Act. In such circumstances, *Reyes* teaches we must apply the rule of the "mixed motive" caselaw:

> We observe that possibility appellants' allegations could be characterized as a mixed motive claim. Indeed, this appears to be the crux of their argument. Although the appellants do not dispute that they were in breach, they rebut ARCO's evidence by arguing that there is an issue about whether ARCO's racial bias against them also played a part in ARCO's decision to terminate. To avoid summary judgment under this theory, the burdens are slightly different. A plaintiff must show "that it is more likely than not that a protected characteristic played a motivating part" in ARCO's decision. *Sischo-Nownejad*, 934 F.2d at 1110 (internal quotations omitted). Once that is done, ARCO can "escape liability only by proving . . . that the [franchise] decision would have been the same even if the characteristic had played no role." *Id*. We think ARCO has met this burden and that the appellants have failed to meet their corollary burden of creating a genuine issue about whether ARCO's decision would have been

---

[6] SSD's motion to strike based on invocation of the attorney-client privilege is denied given that SSD concedes that the invocation of the privilege was proper (Reply Br. at 1). The Court has, however, taken into account (in SSD's favor) the invocation of the privilege and the calculated way in which Chevron constructed its termination-decision meeting to produce a thin and conclusory record as to what was said during the meeting.

16

1                 any different absent its obvious racial bias against appellants.
2                 We therefore affirm the District Court's decision dismissing the PMPA claim.

12 F.3d at 1471.[7]

SSD has shown that it is more likely than not that an inadmissible reason was at least *a* motive in this termination. So, the ultimate issue boils down to whether Chevron has proven that the termination decision "would have been the same" even if the inadmissible motive had been absent.

In SSD's favor, it must be said that Chevron's accusation about underpaying sales tax and criminal misconduct was high-handed and over the top, precisely capturing the Big Oil evils that provoked the Act in the first place. But, otherwise, Chevron has made solid and provable accusations in this case. Were the facts less compelling, Chevron's reckless accusations might have cratered its case.

This order holds that Chevron has carried its burden on the issue. The reason is the severity of SSD's violation. At the risk of repetition, all of us must meet our tax obligations to our country and state. To intentionally evade those obligations for three consecutive years in a row, at both the state and federal levels as SSD did, was inexcusable. SSD would have continued right on violating the tax laws had Chevron not interrupted and asked for the audit. This was not merely a technical or unimportant violation without relevance to the franchise relationship.

There were at least four serious consequences. *First*, SSD's business ethics were tarnished; a franchisor should not be forced to continue on with such an untrustworthy business partner. Chevron has demonstrated that business ethics are an important factor in the franchise relationship (TX 18; Tr. 348). *Second*, the records needed for the full audit were not available; the records made up after-the-fact were more susceptible to manipulation. *Third*, the three-year violation led to the suspension of SSD's corporate right to do business; this was cured but it

---

[7] In 1991, Congress amended Title VII to modify the mixed-motive analysis relied on in the *Sischo* decision cited in the block quote above. However, that change was known by 1993 when *Reyes* was decided. *Reyes* remains good law. This order will follow *Reyes* despite the change in Title VII law.

1  placed a twelve-month cloud over the operation of the business.  *Fourth*, the violation could
2  have led to tax liens on SSD's interest in the premises and station.  These factors in combination,
3  especially the first two, are powerful.  They convince the Court that Chevron would have
4  terminated for proper reasons so serious as to undermine the entire relationship, even in the
5  absence of inadmissible motives against SSD.
6      For the foregoing reasons, Chevron's notice of termination is sustained.  Without
7  prejudice to any appeal rights, counsel shall meet-and-confer over a form of final judgment and
8  submit it by **NOON ON SEPTEMBER 21, 2006**.

10    **IT IS SO ORDERED.**

12  Dated:  September 12, 2006.

        WILLIAM ALSUP
        UNITED STATES DISTRICT JUDGE